Good morning, Your Honors. Elizabeth Rader from Alston & Byrd on behalf of the appellant Clevo Company. The District Court erred in relying on the Unimac case to read the statute of limitations from bills of lading for shipments into a separate guarantee agreement between Clevo Company and Hecny Transportation International, or HTI, the Miami entity of Hecny Group Consortium. Please keep your voice up and articulate. I'm a little deaf. My voice is a little froggy, so I'll crank it up a bit. Could I ask you, you could use your time any way you want, but the Unimac case, the essential reasoning in a Unimac case is a decision of the District Court somewhere in the Eleventh Circuit. Correct. We're not bound to follow that, nor even the Eleventh Circuit's opinion, which sort of accepted almost without real discussion the holding of the District Court. So suppose we're not obligated to follow this Unimac case. That's exactly right. What is your basic argument as to why you should win? Our basic argument is that Clevo set out to protect itself in the event that an entity far away from Taiwan or Shanghai released the goods before they were paid for. The agreement between Clevo and Amazon contemplated that the goods would be put on a ship in Shanghai when they were only 30 percent paid for, and then at some point while the goods were on their sea voyage headed toward Los Angeles and eventually to Manaus, they would be paid for, and then they would be released to Amazon in Brazil. But Clevo had no former course of dealings with the entity in Brazil or the entity in Miami, and therefore it sought to protect itself from the possibility that the goods would be released before they were paid for. Right. And HSL sought to protect itself and its agents and subs in the Bill of Lading. And to the degree that the Himalaya Clause in the Bill of Lading protects and overrides the independent contract between Clevo and HSL or HTI, then the Bill of Lading controls. So the question is, what's the consequence of the Bill of Lading and the Himalaya Clause? Is that right? So the Bill of Lading actually at paragraph 23 expressly provides for the kind of agreement that we see in the guarantee letter. It's the very, very last paragraph. You can find it at ER 515, among other places. And it says that one of the carriers that would otherwise be covered by the Bills of Lading can make separate arrangements and vary the contract. And that's exactly what we submit happened here in the guarantee letter. The guarantee letter is really a separate contract that talks about an obligation to hold goods, not an obligation to carry them or deliver them, Your Honor. Well, I understand that. But as I read the Bill of Lading, it says, Each merchant agrees also that all agreements and freight arrangements previously made for the carriage of goods are superseded by the contract contained or evidenced herein. So to my mind, the question is whether or not the prior separate contract about prior notification, which clearly is designed to protect Clevo. I got that. I mean, I understand the purpose is very clear, and I'm sympathetic to the purpose. But is that contract an agreement or freight arrangement previously made for the carriage of goods? To my mind, it's a very simple question. Does that other contract come within that meaning of that phrase? No, it doesn't, Your Honor. It's not a contract for the carriage of goods because it clearly states it's a guarantee to hold the goods. And the second provision is a guarantee to make Clevo whole by compensating it in the event that there are any damages. So the carriage of goods is already complete by the time the goods are released. So it's really a separate obligation. Can I ask you something? I know very little about Bills of Lading. And I actually, even with my glasses on, could not read the back of the Bill of Lading because the type was so small. Did your client have anything to do with the preparation of the Bill of Lading? Did it formally agree to its terms? It was not clear to me. I don't think Clevo had any choice about the terms of the Bill of Lading. No, no, but it didn't seem to me that it was. It seemed to me that it was prepared by one of these H's. Was it Singapore? It was Hong Kong. Hong Kong. But did your client, did it sign it? I mean, I just couldn't. I'm trying to figure out what role your client had. Did it somehow affirmatively agree to the terms of the Bill of Lading? I mean, is there a signed contract? Does your client initial the Bill of Lading? I couldn't figure that out from looking at the Bill of Lading. I'm embarrassed to say I don't know. I don't believe they do sign it because it's issued by the shipping company. But in the underlying Amazon contract, Clevo agreed to ship with the Hackney Group. I know, but they seemed, if I understand this, and, again, I preface this by my lack of expertise in Bills of Lading, they're relying on a Bill of Lading, which your client may not, did not prepare, may not have signed in order to, and they're using it to say that that undermined the signed agreement, the guarantee letter. Exactly. That strikes me as a strange argument if the premise is, if I'm correct, that this was almost like it was a unilateral act by, what is it, whichever H we're dealing with. Hackney Shipping. Yeah. My understanding of the Bills of Lading is it's take it or leave it. If you put your goods on the ship, you're agreeing to the Bills of Lading. But let me ask the question. Yeah, but you didn't even, they didn't even agree. I mean, it didn't even strike me that they actually ever read it before it was, it was, they may have. I mean, after all, these, the originals were sent to them. But I never saw any affirmative assent to this. I mean, I'm sorry. I don't know if you don't know the answer. I don't mean to. No, I'll assume my colleague is looking for the answer right now. But we've never argued that. Let me ask it this way, which I think is a variation on the same question. Okay. Does your client or do you argue on behalf of your client that you're not bound by the Bill of Lading? We have never made that argument yet. So the question is what's the meaning of the Bill of Lading? Yes. The question is what's the meaning of the Bill of Lading and what effect does it have on the interpretation of the guarantee letter? So it's clearly a contract of adhesion. Yes. But you're not arguing that you're not bound by it. Perhaps we should have, but I don't think we've made that argument yet. No, no, no. They seem to think that you are making the argument because they argue that you somehow adopted the Bill of Lading by suing on it. So somebody is, somebody must think that you made an argument of some kind. There's a case, I think it's Pacific, that says that you adopted the Bills of Lading by suing on them, but that case didn't involve a separate agreement. No, no. I'm not, I'm not. All I'm saying is, is that they may have gotten the impression that you were making that argument because they essentially responded to it. Go ahead. This may be a separate question. You wouldn't be in this fix if you had gotten the agreement to extend the period of the statute of limitations from HTI, right? That's correct. Your basic problem stems from the fact that you got the agreement to extend the statute of limitations only from HSL. That's correct. And I don't read anything in your brief that disagrees with Judge Morrow's conclusion that while HTI can be the beneficiary of the Himalaya Clause without having signed or been a part of the Bill of Lading, it cannot be deprived of the advantage of the Himalaya Clause without itself signing something to deprive itself of the advantage of that, the protection of that clause. Did you make any such argument? I didn't find one. We didn't choose to appeal that finding, that holding, no matter. Right. So whatever the Himalaya Clause means, HTI has the benefit of it. Your argument is that it doesn't protect. Yes, exactly. Right. Okay. Got it. So it would have the benefit of it if we weren't seeking compensation under the guarantee letter, you know, if the goods had fallen into the ocean or something. Right. So for me, the question really comes down to the meaning of, again, I'll say it again, of the provision in the Bill of Lading that says all agreements and trade arrangements previously made for the carriage of goods are superseded. What is a contract for the carriage or an agreement for the carriage of goods? In a way, I'm sympathetic to your argument because it doesn't say an agreement with respect to the carriage of goods or concerning the manner in which the goods will be carried. It is an agreement for the carriage of goods. On the other hand, I have trouble accepting your answer which says, well, but this is not part of an agreement for a carriage of goods because the goods had already been carried. Well, release of the goods at the end is part of the carriage of goods. So can you help me out a little bit? I agree that release of carriage is, you know, the last part of the carriage. Yeah. But that isn't the main point of the guarantee letter. There's two points of the guarantee letter. We won't release, and second, if we or one of our agents does release, we'll compensate you for your damages. This is like an insurance policy, only it happens to be with the last party that has the physical control over the goods. And I think, you know, there would be no question if they insured with Lloyd's of London or something for loss of the goods that they could get protection outside of the bills of lading because Lloyd's isn't a subagent of the Hackney Group. So what they tried to do is get the same kind of guarantee from an agent, and really the guarantee letter was in support of the underlying agreement between Clevo and Amazon and not – that's why they don't consider it a contract for a carriage of goods. Well, if they had an obligation not to release without permission, it seems to me that it follows automatically, even without the additional clause of promise for compensation. If they breach the obligation, that's ordinary contract law. You pay for the damage. So I'm not sure that the clause that says if we do release in violation of our agreement, we need to pay you damages. I don't think that sentence performs any work that's not already performed by the undertaking of the obligation not to release without past permission. Do you follow the question? I see what you're saying, but you and I are trained in American law, and the drafter of the guarantee letter was, you know, sitting in Taiwan and may not have understood that that was the remedy for the breach of obligation. But I don't think you're, again, objecting to this part of the judge's opinion that says that California law governs. Not at all. We've always thought California law. So this is governed by California law, so our training in American law might be helpful. Yes. I'm not saying it wasn't helpful. I'm just saying that the person who drafted the guarantee letter may have thought it was important to include that. But what I'm saying is, at least as I understood your argument, you're saying the fact that there is a separate clause there promising to pay damages makes this a separate undertaking, separate contractual obligation. I don't think it does, because I think the obligation not to release in advance automatically carries with it the obligation to pay damages. And while the sentence is not inconsistent with that, it simply states what we already know. I understand the Court's point. But this is still an independent obligation not to release that Hackney Transportation in Miami didn't have to agree to, but chose to in order really to encourage Clevo to make these shipments. It was looking for more business flowing from the arrangement between Clevo and Amazon. Yeah. Now, this is not currently before us, because the entire fight here is about the contractual statute of limitations. If you were to get to the merits, you've obviously got a course of dealing problem, because you've got 20 shipments, all of which seem to have been released without permission, and then one goes bad, and then you choose to sue. But that's down the road. That is down the road. Yes, we didn't know that when we drafted the complaint, obviously. We just knew that these two shipments were released without being paid for. It now seems quite possible that 19 other shipments were released without being paid for, and we just don't know. We haven't had discovery on that. Okay. We know that one shipment really was a sea shipment that went by sea the entire way from Shanghai to Manalis, and on that occasion the bills of lading were required. Okay. Why don't we hear from the other side, and then we'll give you a chance to respond. Can I reserve? Yes, please. Thank you, Your Honor. May it please the Court. Andy Cahadris on behalf of Hackney Transportation, Inc. Before I launch into what was certainly going to be an insightful presentation, I do want to pick up, Judge Corman, on a point that you raised about the bill of lading. The emphasis on the bill of lading in the papers was for the purpose of illustrating that this was the document that put everything in motion. The bill of lading is the basic contract of transportation, and that's in the Southeast case with the Supreme Court. Delivery is the essence of that. Our objection to their position about delivery is that it can't be broken up. In other words, you can't take parties in the transportation chain and say X has a and so does Y and so does Z. The delivery obligation is bound up in the bill of lading with the carrier. You ask, well, is there a question about that bill's application? And while the circuit and others have held it to be a contract of adhesion, it is nevertheless the contract of transportation, and there is language to the effect in most bills of lading. I can't point the Court to this one right here, but upon the tender of goods, the shipper binds itself to the terms and conditions. And, in fact, the M.P. Honjo-Yosu case, again from the circuit, says if you sue on the bill, you do, in fact, accept its terms. So I hope that addresses that aspect of it. So, I mean, what you're saying is, if I understood you, you're accepting the underlying premise of my concern, which is that they had nothing to do with the bill of preparation of the It contains a clause that you're relying on that undermines a signed agreement that they entered into. And you're saying they've become bound by it because they sued on it. Yes, Your Honor. And, in fact, the bill's definition of merchant includes the shipper, which Clevo was, as well as any party with an interest in the goods, as a merchant. And as the Court probably knows from looking at these clauses, most of them, in fact, do try to bind merchants, which is a broad class of people, beyond just the shipper. But here we did have Clevo as a shipper. We do have a 20-shipment course of dealing with these parties, a sophisticated shipper at that, which, again, this circuit holds to a higher standard. So this was nothing new, Your Honor. Was there a signature on this? Absolutely not. No, there wasn't. But my point in answering the question the way I am is that we didn't need a signature in this case based on course of dealing, based on the bill of lading being the premise for this Court's jurisdiction and for revenue. You know, somehow, if I put aside all of that, you could respond to it. I'll tell you what's bothering me. It makes entirely, I think it's an entirely unjust result to deprive them of the benefit of this signed agreement based on all of these legal principles that don't seem to me to make any sense. Your Honor, maritime law is... I said you could respond, but that's what's bothering me. And, you know, my experience sometimes, if things bother judges, they look for ways around them. Let me help you, Your Honor. Maritime law is unique among the bodies of federal law. The Carriage Goods by Sea Act, which, while it doesn't apply expropriatory in this case, is the basis for a lot of the clauses that we see. For example, the one-year time bar tracks that of the Carriage Goods by Sea Act, CAGSA. CAGSA enacted in this country in 1936 was the U.S.'s incorporation of that 1924 Hague Convention. So this is a global phenomenon. And in order for commerce, global commerce, to work, seafaring nations have established this framework in the U.S. for going back to the Harder Act, which preceded the Carriage Goods by Sea Act, for over a century. These types of practices have been in place in order to keep global commercial and maritime trading expectations constant. And hence, one of my arguments about the concern for uniformity. Their argument would lead to a result where the carrier has one statute of limitations, maybe the U.S. forwarder has a different one, and maybe the Brazilian forwarder has another one. Now, I bring up the Brazilian forwarder. So what? Your client agreed to it. So what's the big deal about uniformity? He agreed to this particular, or he, I'm sorry, it agreed to this guarantee. There was, in my mind, deficient consideration here. And so there's a different statute of limitations. In fact, there is a different statute of limitations because they signed some, one of the clients, one of the H companies signed a provision to total the statute afterwards. I forget what the name of the. HSL, Your Honor. Yeah. So they're, in fact, you're relying on a shorter statute of limitations by virtue of an agreement. You're getting the benefit of a shorter statute of limitations because they signed an agreement for a longer statute of limitations with another entity. Well, that's exactly right. Of which you were a third-party beneficiary of that agreement. So there is a different, we're operating right now with two different statutes of limitations because of an agreement that's been made. So what's the big deal? Well, because that is something that the carrier by contract elected to do. And again, realizing that that aspect is not on appeal. But the MV Antonia case, the SS Flatero case, made very clear that a Himalaya beneficiary can stick to the defenses and immunities in a bill of lading, notwithstanding that a carrier elects by contract to give up some of those rights. Well, if this had been just, say, ABC Freight Forwarder down there in Brazil or wherever it was, and with no affinity with the other HECME corporations, would it be protected by the Himalaya Clause? Just a freelance freight forwarder that has no connection with the carriage or with any COBSA at all, just a freight forwarder? Your Honor, the answer to that is to the extent that a party is carrying out some portion of the carriage that the carrier undertook. My answer to your question is yes, that even an unrelated entity, and actually this Brazilian freight forwarding entity, which the complaint calls HECME Brazil, was an independent entity. Is that a gratuitous beneficiary? That is, if a freight forwarder can say, I'm protected by the Himalaya Clause because I happened to pick up this forwarding account, this business making the final delivery to the consumer, and I negligently let this property be delivered without proper authority, my public or tort liability carrier would be liable for the negligence ordinarily. Why wouldn't the same rule apply if there's a written agreement between the freight forwarder and the shipper that will guarantee that the delivery terms will be carried out? First of all, we have always taken the position that the guarantee letter was not a contract, number one. Number two, because that guarantee letter, and it's not a contract of suretyship, even if it is a contract, it just does not meet the California legal definition of suretyship. So to call it a guarantee letter does not make it such. Back to Your Honor's point, though. The Bill of Lading expressly addresses misdelivery, and again, this goes back to my previous point, which is that delivery is the carrier's obligation. HTI at all times did what it did in this three-continent, multimodal move in Miami. I remind the Court respectfully that the cargo arrived in Brazil on a plane, and in three instances in the second amended complaint, and I can point the Court to the ER, the allegation is HECNE Brazil released the cargo. And again, part of our transportation chain, these are important details. This was a routed shipment. This was Amazon going to its local freight forwarder for this routed shipment and saying, help me get this stuff here from point A to point B. Has HECNE Brazil been named as a defendant in the suit? Yes, Your Honor. Never served, though. They're alleged to have been an agent of the named defendant. I keep getting all these H's confused, but is it HDI? HECNE Transportation. There have been allegations that each HECNE entity was the agent of the other, but again, understanding the nature of this transaction and which entity performed which function, the evidence, the record does not bear that out, Your Honor. HDI is in the middle, receives the goods at the final maritime port here, was the port of Los Angeles, across the country by truck to Miami, then on a plane to Manaus. And the guarantee letter, if we're going to focus back on that for a moment, Your Honor, talks about sea shipments. This was not a sea shipment. This was a sea air shipment. It actually cost more to do it the way these folks did it. Intermodal all the way. Yes, sir. Your Honor, I hope that I answered your question about the inapplicability, because, again, it just goes back to not being able to parse out the carrier's delivery obligation and impose that on the Miami entity for a delivery that took place and was always going to take place at the airport in Manaus, Brazil. Now, it's true that HSL, a Title 46 non-vessel operating common carrier, this entity undertook the transportation from the Far East to Manaus. I think it was Shanghai. Port of Shanghai was the port. But, again, the delivery obligation at all times was going to be at the airport, and this maritime carrier undertook that delivery in Brazil, but it doesn't mean that every other party in the chain undertook that. So I don't think it jives legally, nor do I think that it makes factual sense looking at this record. Now, did the district judge, I don't recall her having ruled on this point, although she mentions the manner of transport, but I don't recall the district judge having ruled in your favor applying the one-year statute of limitations on the ground that the contract between HTI and Clevo referred to sea shipments, and this was not a sea shipment. There was something I missed in the district court. No, Your Honor, you're correct in that statement. So if we were to conclude that she's wrong with respect to the coverage of the Himalaya Clause and that the Himalaya Clause does not cover this contract, and therefore this contract has a four-year statute of limitations, the ordinary contract limitation. The next question might be, well, does the contract cover the shipment at all? But she's not reached that. That's correct, Your Honor. This is here before court. I'm kind of simple-minded about this case, I have to confess. I want to come back to the phrase that I read when your adversary was up here, and this is just from fairly early on in the Bill of Lading. It says, Each merchant agrees also that all agreements and freight arrangements previously made for the carriage of goods are superseded. Why is the contract governing the manner of release and governing only the manner of release? Why is that a contract, quote, for the carriage of goods, when in fact it does not cover the carriage in its entirety but covers only the manner of release at the tail end of the carriage? Because delivery is inextricably bound to the carrier's undertaking to transport the goods from point A to point B, and if the carrier, as it can under the Bill of Lading, delegates that function out to someone, and keeping in mind that this Bill of Lading also states right below in Clause 5 that the carrier enters into this contract as the agent of all of these subcontractors. So it's as if the carrier is taking the bull by the horns and saying, Here's our undertaking. We're here on behalf of everyone that's going to do anything in furtherance of the carriage. And these are the terms. It says right on there who the delivery agent is. So these roles are clearly spelled out. So it's implicit in the very nature of the Himalaya Clause that the contracts that will be superseded by and then governed by the Himalaya Clause will be contracts for partial carriage, that is to say for performing only part of the work of carriage, because it's understood that what we've got here is the initial carrier, HLS, HSL, but then it's going to be carried out, actually, through these various subs or contractors, and each contract for its portion of the job is governed by the Himalaya Clause. Yes, Your Honor, and it's actually a very good point in the sense that as a non-vessel operating common carrier, HSL had to go to Maersk Line, the vessel operator, and then there was a trucker that took these goods across country, and then an airline, a direct air carrier, AeroAir, performed its segment. And sure, along the way, some people handled, took cargo out of the containers, built up the loads for air transport. And even though they perform only part of the carriage, it's undisputed that they're governed and protected by the Himalaya Clause. Yes, Your Honor. Okay. Unless there's anything further. Does the definition have – I mean, you agree that this bill of lading is an adhesion contract. That has been the holding among the circuits, Your Honor. And the only reason why I hesitate, because that is the traditional rule in the Ninth Circuit and elsewhere. Some of the recent Supreme Court cases, specifically the Norfolk Southern case, have cast doubt on that. And this isn't just my musings on the subject. I read a district opinion not too long ago where the judge took the opinion that, you know, because of the way the Norfolk Southern ruling came down, maybe these aren't contracts of adhesion, but certainly the law of the circuit is as such. And they would be, therefore, narrowly construed. They would be construed against the person or the entity that prepared it. That has been the traditional rule. Yes, Your Honor. So if contract of carriage theoretically can have arguably two meanings, one could take the meaning that's most favorable to Clevo. Where there is an ambiguity, I would agree. I don't think that any of the terms that we've been discussing, the Himalaya Clause, the Integration Clause, the limitations provision that includes misdelivery, I don't think any of those are ambiguous, so I don't think any of them are susceptible of more than one reasonable construction. Okay. Thank you. Thank you, Your Honor. Why don't we put two minutes on the clock and see what happens. Thank you. Well, Your Honors, you can see why Clevo wanted some additional guarantees to the bills of lading, because the goods were going to be passed from hand to hand halfway around the world. And Clevo had absolutely no control other than this guarantee letter or the bills of lading after the goods were put on the ship in Shanghai. I wanted to respond to Judge Corman's point, because I think it's very clear that at the time that this agreement was signed, HGI never thought it had any liability under the guarantee letter. It seems to have just signed this agreement to make Clevo happy and encourage Clevo to carry on its business relationship with its customer, Amazon. And the reason that you can see that is they're taking the position that this guarantee letter never applied at all to any shipment that was entirely by sea. And yet there was no reason for Clevo to even ask Miami, the Miami entity of HECME, to sign an agreement like that, because the pure sea shipments go from Shanghai directly to Manalis. They would never go anywhere near Miami. It doesn't make sense. But that argument, I think I just ascertained, is not in front of us. That is to say, the district judge didn't rule on the question as to whether or not the restrictive term sea in this agreement meant that this agreement doesn't apply to the circumstance in front of us. That's correct. The district judge seemed to conclude in her recitation of the facts that it was that these were not sea shipments, that the only sea shipment was Shanghai to Manalis. But the court didn't base her decision on that, on a finding of that. Yeah. She notes it, but I don't think she makes any holding based on that. Her holding was entirely based on reading the statute of limitations from the bills of lading into the guarantee agreement through the Himalayan process. And with, I think, an assumption that the separate contract between Clevo and HTI governed, absent the bill of lading. Yeah. Right. My point was just that it seems to me an unfair result, as Judge Corman pointed out, and that Hackney Transportation seems to have entered into this guarantee letter thinking it could never be liable under it. And yet, Hackney Transportation, Inc. never said to Clevo, this is going, as an inchoate agreement, it's going to be null and void, the second Hackney shipping issue is the bill of lading. No. They just signed it to make the transaction move forward. And that's all the more reason why this kind of seems to me neither here nor there for purposes of the statute of limitations argument that we now have. That may be. They may have disregarded it. Their course of conduct suggests that they disregarded it because they never asked for the bill of lading, except maybe once. Yeah. I think what the Court is saying is this is a pure issue of law, whether the statute of limitations should be imported through the Himalaya clause to apply to the guarantee letter. And I agree with that. I think, yeah, I think that is right. Yeah. Yeah. Okay. If I have time left, I'd like to point out that the Shanghai entity of the Hackney group also seems to have understood that it was under an obligation not to release the goods without an original bill of lading. And you can see in the record a complete breakdown of communication between the Hackney entities. Yeah. But then you're getting to the merits again. Yes, I am. Yeah. Okay. If there are no more questions, I'll submit. Okay. Thanks. Thank you both sides. No. He's saying time. Thank you. Good argument. Yeah. Thank both sides. It's up to the work because I speak only for myself. I am not an admiralty expert. Thank you very much. Clevel versus Hackney Transportation submitted for decision.
judges: Korman, Goodwin, Fletcher